# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | | |
|---|---|---|
| Debra Henson, Individually, and as Next Friend to J.M.H., a minor child, And Brianna Henson, | § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | Civil Action No. 1:19-cv-573 |
| FCA US LLC, | § § § | |
| Defendant. | § | |

## PLAINTIFFS' COMPLAINT

**To the Honorable United States Judge of Said Court:**

COME NOW, Debra Henson, Individually and as Next Friend to J.M.H., a minor child and Brianna Henson (hereinafter referred to as "Plaintiffs"), and respectfully file this Complaint against FCA US LLC (hereinafter referred to as "Defendant"), and in support hereof would state and show the following:

### I. Parties

1. Plaintiff Debra Henson is the surviving spouse of Mark Henson, deceased, and the biological mother of J.J.H., a deceased minor. She resides in and is a citizen of Cleveland, Texas.

2. Plaintiff J.M.H. is a minor child. She resides in and is a citizen of Cleveland, Texas. She appears in this action through her Next Friend, Debra Henson, her biological mother.

3. Brianna Henson is an individual. She is also the biological mother of L.J.P., a deceased minor. She resides in and is a citizen of Midlothian, Texas.

4. Defendant FCA US LLC is an entity formerly known as Chrysler Group LLC, incorporated in Delaware, with its principal place of business in Auburn Hills, Michigan. Defendant's sole member is FCA North American Holdings, LLC, an entity incorporated in Delaware with its principal place of business in New York. FCA North America Holding LLC's sole member is Fiat Chrysler Automobiles N.V., a publicly traded company incorporated in the Netherlands with it principal place of business in London. Service of process upon this Defendant may be had by serving its registered agent for service, CT Corporation System, at 1999 Bryan, Suite 900, Dallas, Texas 75201.

## II. Jurisdiction

5. This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. Section 1332.

6. The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## III. Facts

7. On or about January 23, 2019, Brianna Henson was driving a 2011 Dodge Avenger (VIN#1B3BD1FB7BN591186) traveling northbound on FM 163 in Liberty County, Texas.

8. Mark Henson and J.M.H., J.J.H. and L.J.P., minor children were passengers of the subject vehicle.

9. The subject vehicle was designed by Defendant.

10. The subject vehicle was manufactured by Defendant.

11. The subject vehicle was marketed by Defendant.

12. The subject vehicle was also assembled and tested by Defendant.

13. Another vehicle traveling southbound on FM 163 crossed into the northbound lane causing a collision with the subject vehicle.

14. During the accident sequence, occupants of the subject vehicle sustained serious and fatal injuries when the vehicle failed to protect them because it violated several crashworthiness principles.

15. Crashworthiness is the science of preventing or minimizing injuries

16. There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

    1. maintain survival space;

    2. provide proper restraint throughout the entire accident;

    3. prevent ejection;

    4. distribute and channel energy; and

    5. prevent post crash fires.

17. When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

18. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

19. Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails.

20. Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of an accident versus the cause of an injury.

21. Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death **following** an accident through the use of a vehicle's various safety systems.

22. Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

23. General Motors has stated in the past that, "The rich don't deserve to be safer

… Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

24. Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

25. Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle. Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

26. It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

27. In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

28. This is cemented by the fact that every state of the United States has case

law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

29. Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public." Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles.

30. Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the public.

31. Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she said, "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

32. Additionally, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues. The report stated, "NHTSA also lacked the focus and rigor expected of a federal safety regulator". It was also stated that NHTSA staff has a "lack of

knowledge and awareness regarding the evolution of vehicle safety systems they regulate."

33. Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When it knows—or, through reasonable diligence, should know—that a product design presents a latent hazard or foreseeable risk of injury, it should go above and beyond the minimum requirements set forth in mandatory standards, rules, and/or regulations.

## IV. Cause(s) of Action as to Defendant FCA US LLC

34. It was entirely foreseeable to and well-known by Defendant that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

35. The injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

36. Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question.

37. As detailed herein, the vehicle contains and/or Defendant has committed either design, manufacturing, marketing, assembling, and/or testing defects.

38. Defendant either knew or should have known of at least one safer alternative design which would have prevented the injuries complained of herein.

39. In addition to the foregoing, Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts. The vehicle is defective and unreasonably dangerous, manufactured, assembled, marketed, and/or tested because Defendant knew and/or should have known of the following, non-exhaustive list of defects:

   a) The vehicle violated consumer expectation;
   b) The vehicle failed to provide proper restraint;
   c) The vehicle failed to provide proper protection in narrow, frontal offset, moderate offsets or oblique/angles impacts;
   d) The vehicle failed to utilize UHSS, AHSS, boron, martensite, ferrite, complex phase, dual phase or TRIP steel in the following areas: safety cage, cross car beams, underbody, header, pillars, side rails, cant rails, door ring, occupant compartment zone, occupant survival space, roof structure, side structure and front structure;
   e) The vehicle failed to utilize MPa rated steel in the safety cage, roof structure, side structure, front structure and underbody structure of at least 1100;
   f) The vehicle failed to properly channel, distribute and dissipate crash forces away from the safety cage;
   g) The vehicle failed to maintain the survival space;
   h) The vehicle failed to provide reasonable occupant protection;
   i) The vehicle was not properly subjected to narrow moderate and oblique frontal offset testing;
   j) The vehicle was not subjected to rigorous engineering analysis;
   k) The vehicle contained a load limiter that allowed excessive excursion;
   l) The vehicle lacked safer alternative designs than other vehicles that cost even less utilized;
   m) The vehicle violated principles of crashworthiness;

n) The vehicle failed to provide reasonable protection in narrow and moderate frontal offset and angled/oblique frontal impacts;
o) The vehicle failed to contain the following material that would have prevented the destruction of the safety cage, survival space and occupant compartment zone: UHSS, AHSS, EHSS, boron, ferrite, martensite, complex phase, dual phase and TRIP steel;
p) The vehicle failed to contain frontal offset/oblique design counter measures;
q) The Defendant violated NHTSA's due care testing;
r) Defendant failed to conduct vehicle to vehicle frontal impact testing;
s) Defendant failed to conduct frontal impact testing with child sized test dummies in rear seat;
t) Defendant failed to conduct frontal impact testing with dummies positioned in rear or forward facing child seats;
u) Defendant failed to conduct FEM, FEA and finite element modeling evaluating different designs and different materials;
v) Defendant failed to conduct simulated crash testing to evaluate different restraint systems, different materials and different accident scenarios; and/or
w) Defendant failed to use pretensioners in the rear seats.

40. Defendant was also negligent in the design, manufacture, assembly, marketing, and/or testing of the vehicle in question.

41. In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

42. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

43. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

44. If the potential risks, hazards, and/or dangers can't be eliminated or guarded

against, they should at least be warned about.

45. A company that does not conduct a proper engineering analysis that would help it to identify potential risk, hazards, and/or dangers that could seriously injure someone is negligent.

46. Based upon information and/or belief, Defendant either used or knew about advanced safety features used in Europe, Australia, Japan, or some other country and chose not to offer those safety features to American consumers.

47. Defendant's occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

48. When Defendant designed the subject vehicle, it did not reinvent the wheel. Defendant used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicles. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

49. Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendant is also in possession of what, if any, engineering analysis it performed.

50. However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

51. Lastly, the materials from other models, years, and countries will provide

evidence regarding what Defendant knew, when it knew it, and about what was utilized or not utilized as well as the reasons why.

52. The foregoing acts and/or omissions, defects, and/or negligence of Defendant were the producing, direct, proximate, and/or legal cause of the serious and/or fatal injuries complained of herein and Plaintiffs' damages.

## V. Damages to Plaintiffs

53. As a result of the acts and/or omissions of the Defendant, Plaintiffs have suffered past and future: loss of care, maintenance, support, services, advice, counsel, reasonable contributions of pecuniary value, loss of companionship and society and loss of consortium as a result of the death of Mark Henson.

54. As a result of the acts and/or omissions of the Defendant, Plaintiffs have become obligated to pay reasonable and necessary funeral and burial expenses as a result of the fatal injuries to Mark Henson.

55. As a result of the acts and/or omissions of the Defendant, Debra Henson has suffered past and future: loss of care, maintenance, support, services, advice, counsel, reasonable contributions of pecuniary value, loss of companionship and society, and loss of consortium as a result of the death of J.J.H., a deceased minor.

56. As a result of the acts and/or omissions of the Defendant, Debra Henson has become obligated to pay reasonable and necessary funeral and burial expenses as a result of the fatal injuries to J.J.H., a deceased minor.

57. As a result of the acts and/or omissions of the Defendant, J.M.H., a minor child, has endured pain and suffering, emotional distress, mental anguish,

impairment, disfigurement, interference with her daily activities and a reduced capacity to enjoy life as a result of her serious injuries.

58. As a result of the acts and/or omissions of the Defendant, Brianna Henson has suffered past and future: loss of care, maintenance, support, services, advice, counsel, reasonable contributions of pecuniary value, loss of companionship and society, and loss of consortium as a result of the death of L.J.P., a deceased minor.

59. As a result of the acts and/or omissions of the Defendant, Brianna Henson has become obligated to pay reasonable and necessary funeral and burial expenses as a result of the fatal injuries to L.J.H., a deceased minor.

60. As a result of the acts and/or omissions of the Defendant, minor J.M.H. had to endure an accident in which she witnessed traumatic injuries and the death of her sister and her father, entitling her to a by-stander claim against Defendant.

61. The above and foregoing acts and/or omissions of the Defendant, resulting in the serious and fatal injuries complained of herein, have caused actual damages to Plaintiff in excess of the minimum jurisdictional limits of this Court.

## VI. Prayer

62. For the reasons presented herein, Plaintiffs pray that Defendant be cited to appear and answer, and that upon a final trial of this cause, Plaintiffs recover judgment against Defendant for:

    a. actual damages;
    b. prejudgment and post-judgment interest beginning January 23, 2019;
    c. costs of suit; and

d.  all other relief, general and special, to which Plaintiffs are entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**
  /s E Todd Tracy
E. Todd Tracy
State Bar No. 20178650
EToddTracy@vehiclesafetyfirm.com
Andrew G. Counts
State Bar No. 24036408
ACounts@vehiclesafetyfirm.com
Wendell P. "Chip" Martens, Jr.
State Bar No. 24002528
CMartens@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas 75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiffs**